# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

MATTHEW DOMANN, individually, and on behalf of all others similarly situated,

        Plaintiff,

    vs.

SUMMIT CREDIT UNION, and DOES 1-100,

        Defendants.

Case No.: 18-cv-167

Class Action

Demand for Jury Trial

---

## COMPLAINT

---

Plaintiff Matthew Domann ("Plaintiff"), by his attorneys, hereby brings this class and representative action against Summit Credit Union and DOES 1 through 100 (collectively "SCU" or "Defendant").

## NATURE OF THE ACTION

1.    All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel. Allegations pertaining to Plaintiff or his counsel are based upon, inter alia, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.    This is a class and representative action brought by Plaintiff to assert claims in his own right, and in his capacity as the class representative of all other persons similarly situated, and in his capacity as a private attorney general on behalf of the members of the general public. SCU wrongfully charged Plaintiff and the class member overdraft fees.

3.    This class action seeks monetary damages, restitution, and injunctive relief due to

SCU's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging for such overdraft fees breaches SCU's contract with its customers, who include Plaintiff and the members of the Class.

4.      The charging for such overdraft fees also violates federal law. Because SCU failed to describe its actual overdraft service in its Opt-In Contract (because the language in its Opt-In Contract fails to describe the actual method by which SCU calculates its overdraft fees, instead describing a method under which overdrafts only result when there is not enough money in the account to pay for a transaction), and because, alternatively, SCU did not obtain opt-ins from its customers whatsoever, Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*) prohibited SCU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but SCU did so anyway.

## PARTIES

5.      Plaintiff is a resident of Portage, Wisconsin, and was a member of SCU at all times relevant to the class action allegations.

6.      Based on information and belief, Defendant SCU is and has been a Wisconsin state-chartered credit union with its headquarters located in Madison, Wisconsin, operating 34 branches primarily in the Madison, Wisconsin area. SCU is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.      Without limitation, defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of SCU and, upon information and belief, also own and/or operate SCU branch locations. Each of Defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "SCU" is also inclusive of Defendants Does 1 through 100.

8.      Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be

2

amended as necessary to obtain relief against defendants Does 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including Does) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are alter egos in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.    At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.    As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## **VENUE AND JURISDICTION**

13.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     SCU's Unlawful Charges of Overdraft Fees**

15.     SCU is a credit union with 34 branches in Wisconsin and holding approximately $2.8 billion in assets.  SCU offers its consumer banking customers a checking account.  One of the features of a SCU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a SCU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), SCU assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

17.     Overdraft fees constitute the primary fee generators for banks and credit unions.  In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as SCU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions.  (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds?  Filene Research Institute 2010).

18.     The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).  More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled

"Overdrawn", at p. 8). More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

19.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. (*Id*. at p. 1). A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id*. at p. 3). More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id*. at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id*. at p. 3).

20.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

22.     To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_ Rulemaking.pdf, at p. 74-75.

amount of any fees that will be charged for an overdraft, and the

maximum number of fees that can be assessed on any given day;

- The financial institution must state whether alternatives, such as linking
  the checking account to a secondary account or line of credit, are
  available.

- The opt-in consent must be obtained separately from other consents and
  acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft
  program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account
  depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that

meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge

overdraft fees on ATM and one-time debit card transactions.

23.     At all relevant times, SCU has had an overdraft program in place for assessing

overdraft fees which is: (1) contrary to the express terms of its contract with members; (2)

contrary to SCU's representations about its overdraft program to its members; and (3) contrary to

its members' expectations regarding the assessment of overdraft fees.

24.     Under SCU's contracts with its members, SCU has promised that it will only

assess an overdraft fee against an account when SCU pays a transaction that results in a negative

balance for that account.

25.     SCU entered into a contract with Plaintiff and its other customers, which is titled

"Overdraft Tolerance Service Disclosure Agreement" and is referred to herein as the "Opt-In

Contract."  This contract is attached hereto as Exhibit 1.  As of August 15, 2010, SCU was

required by Regulation E to provide a  contract which governs the terms under which SCU may

assess Plaintiff and the Class members overdraft fees for ATM and non-recurring debit card

transactions, to Plaintiff and the Class members, and to provide them with the means to accept those terms.  In the Opt-In Contract, SCU promised that: "An overdraft occurs when you do not have enough money in your checking account to cover a transaction, but we pay it anyway." This promise means that SCU is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction.  It does not in any way state that there will be deductions made from the money in the customer's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed, nor does it state that holds placed on funds in the account arising from deposit holds would reduce the amount of money in the account for the purposes of determining when an overdraft has occurred, and an overdraft fee will be assessed.  Because the Opt-In Contract does not describe SCU's actual overdraft service, the Opt-In Contract also fails to comply with the requirements of Regulation E.  The Opt-In Contract nonetheless contains promises to which SCU is contractually bound.  However, directly contrary to these promises, SCU's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, SCU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation by which it deducts holds it has placed on either pending debit card transactions or deposits, rather than use the actual money in the account as required by the Opt-In Contract.

26.    SCU was not required by Regulation E to use the language in the Opt-In Contract which it used, but rather was required by Regulation E to describe its overdraft fee policy accurately in the Opt-In Contract.  For example,  TD Bank's Regulation E Opt-In Contract, which is attached hereto as Exhibit 2, states as follows:  "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy."  (Exhibit 2.)  SCU clearly could have, as TD Bank does, accurately

described its overdraft program in its Opt-In Contract, but did not. Because it did not, it breached that contract when it charged overdraft fees on a positive balance, and violated Regulation E by charging any overdraft fees whatsoever on ATM and debit card transactions, given that it did not accurately describe its overdraft program in the required contract.

27.     The artificial balance created by SCU which it used is not the customer's actual money in the account. Rather, it is the balance in a customer's account minus anticipated future debits (debits that may or may not occur) and minus deposit holds. Not only is the practice of using this artificial balance method rather than the money actually in the account to determine whether a transaction results in an overdraft and thus is subject to an overdraft fee directly contrary to SCU's Opt-In Contract, but such practices have resulted in SCU improperly charging unlawful overdraft fees. SCU created this "artificial balance" to increase overdraft fees it charged to its customers.

28.     SCU's practice of charging overdraft fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how SCU expressly describes the circumstances under which overdraft fees are assessed. Further, SCU has charged its customers, including Plaintiff and the members of the Class, overdraft fees for ATM and/or non-recurring debit card purchases, without obtaining their appropriate consent to do so, in violation of Regulation E, and in violation of its contractual promises that it would not charge overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers' separate consent, because SCU's opt-in method or methods do not include providing its customers the information required to obtain their legally binding informed consent because, *inter alia*, the description in the Opt-In Contract did not describe what SCU was actually doing, as required by Regulation E. SCU also violated Regulation E by presenting its members with a preselected box marked "opt-in" in its Opt-In Contract. Supplement I to 12 CFR § 1005.17(b) ("Nor does an institution obtain a consumer's affirmative consent by providing a signature card that contains a pre-selected check box indicating that the consumer is requesting the service.").

29.     The importance of Regulation E is highlighted by the fact that the Bureau's study

of actual practices found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

30.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

31.     Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  The money in the account, without deductions for holds on pending transactions or on deposits, as stated, is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.

32.     Further, based on information and belief, it is the balance used by SCU to report its deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting.  It is the balance used by credit reporting agencies in providing credit ratings of SCU.

33.     When SCU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the balance without deduction for pending debit card transactions or deduction for holds on deposits. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." (Supervisory Highlights, Winter 2015, at p. 9.)

34. SCU entered into a second written contract with Plaintiff and its other customers titled "Membership Guide" (hereinafter referred to as the "Account Contract"). The Account Contract contains a promise that SCU will not charge overdraft fees for any type of transaction where there is enough money in the account to pay for the transaction. The terms of the Account Contract are reflected in the version of that which is attached hereto as Exhibit 3. It states, "[i]f, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. . . . If we pay these items or impose a fee that results in insufficient funds in your account, you agree to pay the insufficient amount, including the fee assessed by us, in accordance with our standard overdraft services or any other service you may have authorized with us or, if you do not have such protections with us, in accordance with any overdraft payment policy we have, as applicable." (Ex. 3 at p. 6). Nowhere in the contract are the terms "available balance," "available funds," or "insufficient funds" defined to indicate that fewer than all of the funds in the account will be considered in determining whether an overdraft has occurred. The language of the Account Contract, at most, states in a separate section pertaining to deposits rather than to overdraft fees that temporary holds might take place on certain deposited items before they can be withdrawn, but nowhere is it stated in the Account Contract that overdraft fees could result from holds placed on funds earmarked for pending transactions—the very practice this case confronts.

35. Under the Account Contract, although Plaintiff disputes it, the only funds which even *arguably* might not be considered as "available" for purposes of overdrafts were those which were subject to temporary holds immediately upon deposit (even though this is not stated or disclosed in the section pertaining to overdrafts) but not funds on which holds were placed due to pending transactions. Although it is Plaintiff's position that during the class period SCU,

under its contractual terms with the class members, could only charge an overdraft fee if the balance in the account became negative without regard to any deductions for holds on deposits, or any other holds, the absolute best case scenario for SCU is that it might have been allowed under the Account Contract in certain circumstances to place holds on recently deposited, *i.e.*, uncollected, funds in the account, and deduct those funds from the account balance in determining whether or not an overdraft has occurred, but that it was in any case not permitted to deduct from the account funds on which holds had been placed for transactions which had not yet gone through.

36.     In the alternative, SCU violated its own Funds Availability Policy during the class period because, *inter alia*, that section clearly identifies the situations under which funds might not be available, and SCU expanded it, in practice, to include holds placed on funds earmarked for pending transactions.

37.     SCU's contractual promises in the Opt-In Contract and Account Contract to assess overdraft fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials.  SCU also promises in the Opt-In Contract, Account Contract, and marketing materials that it will not assess overdraft fees on ATM and non-recurring debit card transactions against any customer who does not "opt-in" to the overdraft service.

38.     SCU also had a Business Account Contract.  The Business Account Contract was sent to SCU's business account members, and is the contract which governs SCU's business accounts.  Pertaining to those accounts, in addition to SCU's individual checking accounts, the Business Account Contract contains a promise that SCU will not assess overdraft fees for certain transactions against those members who do not opt-in to the overdraft service.  The Business Account Contract states, "For ATM and one-time debit card transactions, you must affirmatively consent to such coverage.  Without your consent, the Credit Union may not authorize and pay an ATM or one-time debit card transaction that will result in insufficient funds in your account." (Ex. 3, p. 6).

39.     In fact, SCU has adopted a policy of automatically enrolling all of its members with business accounts into the overdraft program, regardless of whether they have affirmatively consented to such coverage, and even if they have indicated that they do not want this service. In so doing, SCU has breached the Business Account Contract with regard to its business account members.

40.     In addition, on information and belief, SCU posts different types of debit transactions in an order that artificially increases the number of overdraft fees assessed without making any disclosure of these orders and making it further unfeasible for customers to be able to keep track of their account and avoid multiple overdraft fees. This is further compounded by SCU's posting practices as evidenced by its mobile app which, on information and belief, appears to back date certain larger debit transactions prior to debit transactions which were authorized on a prior day but post on the same day as the larger transaction, and which result in smaller debit transactions being deemed overdraft transactions when these otherwise would not have been deemed as such.

41.     Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

**B.      Unlawful Overdraft Fees Assessed to Plaintiff**

42.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in his account to cover the transaction. Plaintiff entered two agreements with SCU, wherein SCU contracted to charge overdraft fees only if his account did not have money to cover the transaction. By nonetheless charging Plaintiff overdraft fees when his account did contain enough money to cover the transaction at issue, SCU breached its contracts with Plaintiff and violated Regulation E. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give one example, on February 9, 2017, Plaintiff had a positive balance of $85.51 in his checking account when he made a debit card purchase for $4.63, leaving him with a positive balance of $80.88. Despite the fact that Plaintiff had sufficient funds in his account to cover the transaction, SCU

assessed a $25 overdraft fee against his account.  Subsequently, on February 10, 2017, Plaintiff

had a positive balance of $55.88 in his checking account when he made a debit card purchase for

$11.27, leaving him with a positive balance of $44.61.  Again, despite the fact that Plaintiff had

sufficient funds in his account to cover the transaction, SCU assessed a $25 overdraft fee against

his account.  As another example, with regard to his business account, on November 7, 2017,

Plaintiff had $78.27 in the  account when he engaged in a one-time debit card transaction for

$2.10, but nonetheless was assessed a $25.00 overdraft fee.  As an example of a Regulation E fee

which was charged despite the Opt-In Contract not describing the actual overdraft practice of

Defendant, on December 7, 2017, Mr. Domann was assessed a $25 overdraft fee in his personal

checking account following an ATM withdrawal in the amount of $303.25.  Although the

balance at that time might not have been  positive, since the Opt-In Contract did not describe the

true overdraft policy of the Defendant, the fee should not have been charged.  Plaintiff has a

reasonable belief that a complete review of Plaintiff's and SCU's records will show multiple

instances in which SCU improperly charged Plaintiff overdraft fees for transactions despite the

fact that Plaintiff had enough money in his account to cover the transactions.

      43.     Moreover, the assessment and unilateral taking of improper overdraft fees further

reduces the balance and amount of funds in the account, resulting in and aggressively causing

subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for

which SCU assesses further overdraft fees.  This practice was deemed to be deceptive and

substantially harmful to customers by the Consumer Finance Protection Bureau, which made the

following conclusions in its studies:

> Examiners also observed at one or more institutions the following
> sequence of events after the institutions switched balance-calculation
> methods: a financial institution authorized an electronic transaction, which
> reduced a customer's available balance but did not result in an overdraft at
> the time of authorization; settlement of a subsequent unrelated transaction
> that further lowered the customer's available balance and pushed the
> account into overdraft status; and when the original electronic transaction
> was later presented for settlement, because of the intervening transaction
> and overdraft fee, the electronic transaction also posted as an overdraft and

an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of SCU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

44.    Additionally, because the Opt-In Contract did not describe SCU's actual overdraft service, SCU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions.  Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, SCU failed to obtain Plaintiff's fully informed consent as required by Regulation E in order for SCU to be authorized to charge such overdraft fees.  Because SCU was not legally authorized to enroll Plaintiff into the Courtesy Payment program for non-recurring debit card and ATM transactions, SCU violated Regulation E when it assessed *any* overdraft fees against Plaintiff for non-recurring debit card and ATM transactions.  On information and belief, SCU also violated Regulation E by including a box that was pre-marked "opt-in" on its Opt-In Contract.

45.    Plaintiff was harmed by this practice when he was assessed overdraft fees for nonrecurring debit card and ATM transactions.  A complete evaluation of SCU's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

## CLASS ACTION ALLEGATIONS

46.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

47.    Plaintiff brings this case, and each of his respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

48.    The "Class" is composed of three classes:

**The Positive Balance Class:**

> **All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.**

**The Business Accounts Class:**

> **All United States residents who have or have had business checking accounts with SCU who did not opt in for overdraft coverage and yet were assessed overdraft fees during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.**

49.    Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

50.    This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

51.    <u>**Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))**</u> – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include

thousands of members based on the fact that SCU has approximately $2.8 billion in assets and operates 34 branches in Wisconsin.

52.    Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of SCU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

53.    **Commonality (Federal Rule of Civil Procedure 23(a)(2)** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

a.    Whether, pursuant to the Opt-In Contract, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b.    Whether, pursuant to the Account Contract, Defendant promised to Plaintiff and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

c.    Whether, pursuant to the Account Contract, Defendant promised to Plaintiff and the Class members that its members with business accounts would not be assessed overdraft fees for non-recurring debit card and ATM transactions if they did not opt-in to the overdraft program.

d.    Whether Defendant breached the Opt-In Contract or Account Contract by assessing overdraft fees for transactions when customers' checking accounts contained enough money to cover the transactions;

e.     Whether Defendant breached the Account Contract by charging overdraft fees against its members with business accounts when those members did not opt-in to the overdraft program whatsoever.

f.     Whether the language in the Opt-In Contract— "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."—described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees;

g.     Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received; and

h.     Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

54.     **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Opt-In Contract and Account Contract, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members.  Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class members.

55.     **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and his counsel intend to prosecute this action vigorously.

56.    **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** –
The matter is properly maintained as a class action under Rule 23(b)(3) because the common
questions of law or fact identified herein and to be identified through discovery predominate over
questions that may affect only individual Class members.  Further, the class action is superior to
all other available methods for the fair and efficient adjudication of this matter.  Because the
injuries suffered by the individual Class members are relatively small, the expense and burden of
individual litigation would make it virtually impossible for Plaintiff and Class members to
individually seek redress for Defendant's wrongful conduct.  Even if any individual person or
group(s) of Class members could afford individual litigation, it would be unduly burdensome to
the courts in which the individual litigation would proceed.  The class action device is preferable
to individual litigation because it provides the benefits of unitary adjudication, economies of
scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate
actions by individual Class members would create a risk of inconsistent or varying adjudications
with respect to individual Class members that would establish incompatible standards of conduct
for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous
common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in
the management of this litigation that would preclude its maintenance as a class action.  As a
result, a class action is superior to other available methods for the fair and efficient adjudication
of this controversy.  Absent a class action, Plaintiff and the Class members will continue to
suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and
allowing Defendant to retain the proceeds of their ill-gotten gains.

57.    Plaintiff is not aware of any separate litigation instituted by any of the class
members against Defendant.  Plaintiff does not believe that any other Class members' interest in
individually controlling a separate action is significant, in that Plaintiff has demonstrated above
that his claims are typical of the other Class members and that he will adequately represent the
Class.  This particular forum is a desirable forum for this litigation because both Plaintiff and
Defendant reside in this District, where Defendant operates branch offices, and where its actual

business headquarters are located, and because the claims arose from activities which occurred primarily in this District.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

58.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

59.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.     Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

1.     Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2.     Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.     Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient

adjudication of the controversy, including consideration of:

1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

**<u>FIRST CAUSE OF ACTION</u>**

**(Breach of the Opt-In Contract)**

60.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

61.    Plaintiff and each of the Class members entered into the Opt-In Contract with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

62.    In the Opt-In Contract, Defendant promised that SCU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

63.    The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all Opt-In Contracts for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the Account Contract and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.  The SCU Opt-In Contract does not accurately describe its SCU's actual overdraft policy.  It can be contrasted with the TD Bank Opt-In Contract (Exhibit 2), where TD Bank describes TD Bank's actual policy on overdrafts.

64.    Plaintiff and the Class members have performed all conditions, covenants, and

promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

65.     Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

66.     As a proximate result of Defendant's breach of the contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Account Contract – All Accounts)

67.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

68.     Plaintiff and each of the Class members entered into the Account Contract with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

69.     In the Account Contract, Defendant promised that SCU would assess overdraft fees only when there were "insufficient funds" in the account to pay for the transaction in question.  Nowhere did the Account Contract state that SCU would deduct pending debit card transactions for purposes of determining whether sufficient funds existed when assessing an overdraft fee.

70.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

71.     Defendant breached the express terms of the Account Contract by, *inter alia*, assessing overdraft fees when there were sufficient funds in the account to cover the transaction

or transactions at issue.

72.     As a proximate result of Defendant's breach of the Account Contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Breach of the Account Contract – Business Accounts)

73.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

74.     Plaintiff and each of the members of the Business Accounts Class entered into the Business Account Contract with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

75.     In the Business Account Contract, Defendant promised that SCU would not assess overdraft fees for non-recurring debit card or ATM transactions against those members who did not opt-in to the overdraft program.

76.     Plaintiff and the Business Accounts Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Business Account Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

77.     Defendant breached the express terms of the Business Account Contract by, *inter alia*, assessing overdraft fees against the Business Accounts Class members for non-recurring debit card and ATM transactions when those members had not opted-in to the overdraft program.

78.     As a proximate result of Defendant's breach of the Business Account Contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

79.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

80.     Plaintiff and each of the Class members entered into two contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Opt-In Contract and Account Contract, and Business Class members entered into the Business Account Contract.  The contracts were drafted by and are binding upon Defendant.

81.     In the contracts, Defendant promised that SCU would assess overdraft fees for ATM and debit card transactions only when there was not enough money in the account to cover the transaction.

82.     The contracts incorporated by reference all applicable laws regarding their subject matter, including 12 C.F.R. § 1005.17, which mandates that the Opt-In Contract for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the Account Contract and accurately describe the overdraft fee practice.

83.     Further, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

84.     The material terms of the contracts also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members'

rights and benefits under the contracts.

85.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

86.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program in its Account Contract and Business Account Contract, failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions in its Opt-In Contract, and failing to permit customers to choose whether to opt-in to the overdraft program for non-recurring debit and ATM transactions.  In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class members of the full benefit of the contracts.

87.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

88.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

90.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or

Abusive Acts or Practice.  (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").)

91.     Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION

### (Money Had and Received)

92.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

93.     Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

94.     As a result, Defendant has in its possession money which, in equity, belongs to

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## SEVENTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E)

### C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.))

95.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

96.    By charging overdraft fees on ATM and nonrecurring transactions, SCU violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

97.    Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.) The Opt In Rule states: "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id.*). The description "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).) To comply with the affirmative consent requirement, a financial institution must provide segregated writing of its overdraft practices that are accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

98.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> .... by <u>explaining</u> the

institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E (*Strubel v. Capital One Bank (USA)*, 2016 U.S.Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).)

99.     SCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  SCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but SCU pays it anyway, when in fact SCU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.  Furthermore, Defendant failed to meet some or all of the other requirements of 12 C.F.R. § 1005.17 in obtaining opt-ins from its customers to enter the overdraft fee program, including failing to opt-in those customers whatsoever, and in presenting its members with a preselected box marked "opt-in" in its Opt-In Contract.

100.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions, SCU has harmed Plaintiff and the Class.

101.     Due to SCU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## EIGHTH CAUSE OF ACTION

**(Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18 *et seq.*)**

102.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

103.    By the actions alleged above, Defendant has engaged in deceptive acts or practices against Plaintiff and the Class members in violation of Wis. Stat. § 100.18.

104.    Defendant made false and misleading statements and representations to members of the public, including Plaintiff and other Class members, in violation of Wis. Stat. § 100.18.

105.    Defendant's false and misleading statements and representations were made to Plaintiff and other members of the public to promote the sale of Defendant's products and services.

106.    The false and misleading statements and representations were made by Defendant in marketing materials and contracts provided to Plaintiff and other Class members, which were deceptive because, *inter alia*, Defendant promised Plaintiff and Class members that it would only assess overdraft fees against an account when it paid a transaction that resulted in a negative balance for that account; that it would only assess overdraft fees when there was not enough money in the account to cover a transaction; that it would only assess overdraft fees when there were "insufficient funds" in the account to pay for the transaction in question; and/or that it would not assess overdraft fees for non-recurring debit card or ATM transactions against those members who did not opt-in to the overdraft program.

107.    Those false and misleading statements and representations were intended to induce Plaintiff and the Class members to enter into contracts with Defendant, sign up for an account with Defendant, and/or enter into Defendant's overdraft program.

108.    Contrary to Defendant's false and misleading statements and representations, Defendant had a practice of assessing overdraft fees when there was enough money in the account to cover a transaction. Defendant also assessed overdraft fees for non-recurring debit or ATM transactions when members had not opted-in to the overdraft program.

109.     Plaintiff and the Class suffered pecuniary harm as the result of Defendant's false and misleading statements, including but not limited to wrongfully assessed overdraft fees.

110.     Under Wis. Stat. § 100.18, Plaintiff and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law. Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.     For an order certifying this action as a class action;

2.     For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.     For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.     For an order enjoining the wrongful conduct alleged herein;

5.     For costs;

6.     For pre-judgment and post-judgment interest as provided by law;

7.     For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

8.     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

Dated: March 9, 2018                          Respectfully submitted,


                                               s/Douglas P. Dehler _____
                                              Douglas P. Dehler
                                              Wisconsin Bar No. 1000732
                                              Laura J. Lavey
                                              Wisconsin Bar No. 1079346
                                              O'NEIL, CANNON, HOLLMAN, DEJONG
                                              & LAING S.C.
                                              111 East Wisconsin Avenue, Suite 1400
                                              Milwaukee, Wisconsin 53202
                                              Telephone: (414) 276-5000
                                              Facsimile: (414) 276-6581
                                              Email: Doug.Dehler@wilaw.com
                                              Email: Laura.Lavey@wilaw.com

                                              Richard D. McCune, CA Bar No. 132124*
                                              rdm@mccunewright.com
                                              Jae (Eddie) K. Kim, CA Bar No. 236805*
                                              jkk@mccunewright.com
                                              McCUNE WRIGHT AREVALO LLP
                                              3281 East Guasti Road, Suite 100
                                              Ontario, California 91761
                                              Telephone: (909) 557-1250
                                              Facsimile: (909) 557-1275

                                              Taras Kick, CA Bar No. 143379*
                                              Taras@kicklawfirm.com
                                              Robert J. Dart CA Bar No. 264060*
                                              Robert@kicklawfirm.com
                                              THE KICK LAW FIRM, APC
                                              815 Moraga Drive
                                              Los Angeles, California 90049
                                              Telephone: (310) 395-2988
                                              Facsimile: (310) 395-2088

                                              *Pro Hac Vice applications to be submitted.

                                              Attorneys for Plaintiff Matthew Domann
                                              and the Putative Class