IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MATTHEW DOMANN, individually and
on behalf of all others similarly situated,

OPINION AND ORDER

Plaintiff,

18-cv-167-slc

v.

SUMMIT CREDIT UNION,

Defendant.

---

Plaintiff Matthew Domann has filed a proposed class action in which he alleges that his credit union, defendant Summit Credit Union, misled him (and similarly situated customers) about its overdraft fee policy. *See* Complaint, dkt. 1. In particular, Domann argues that SCU used a method of calculating his balance that deviated from the method described in its contracts with Domann, leading SCU to charge him excess overdraft fees. In this putative class action, Domann brings claims against SCU for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, money had and received, violation of Regulation E of the Electronic Fund Transfers Act (EFTA), and violation of the Wisconsin Deceptive Trade Practices Act.

Defendant SCU has filed a motion (dkt. 9) to dismiss the First Cause of Action (breach of contract based on SCU's "Opt-In" form); Second Cause of Action (breach of contract based on the Membership Agreement); Fifth Cause of Action (unjust enrichment); Sixth Cause of Action (money had and received); and Seventh Cause of Action (violation of EFTA (Regulation E)).

For the reasons that follow, I am granting defendant's motion.

## I. BACKGROUND

Overdraft fees have attracted the attention of regulators and the media in recent years.[1] In 2009, the Federal Reserve adopted Regulation E, a set of rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." Electronic Fund Transfers, 74 Fed. Reg. 59,033-01 (Nov. 17, 2009) (codified at 12 C.F.R. § 205.1). Regulation E "require[s] financial institutions to secure a customer's 'affirmative consent' before charging overdraft fees," which must be obtained through an opt-in notice. This opt-in notice must contain a "brief description of the financial institution's overdraft service" and be "substantially similar" to the Fed's Model Form A-9. 12 C.F.R. § 1005.17(d).

Overdraft fees are tied to the customer's account balance. Financial institutions primarily use two methods to calculate an account holder's checking account balance: the "ledger" balance and the "available" balance. As described by the Consumer Financial Protection Bureau ("CFPB"),

> [a] ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared.

CFPB, Winter 2015 Supervisory Highlights, Section 2.3.[2]

---

[1] For a thorough review of this history, see *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

[2] Matters outside the pleading cannot be considered unless the motion is treated as one for summary judgment, and the parties are given "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008). However, there is "a narrow exception to the Rule 12(d) instructions that permits a district court

The following example illustrates the distinction:

> If a member has a $100 ledger balance but uses his debit card to buy dinner for $40, then there is a pre-authorization hold on his account (at the request of the restaurant), and his available balance (the money he has left to use) is $60.00. In other words, the $40, which the member just spent, is no longer *available* for use. His ledger balance is still $100 until the restaurant charge is submitted and posted to his account. On the credit side, if he deposits an out-of-the-state check in the amount of $5,000 a hold will be placed on all but $200. In this example, his available balance is $200 and his ledger balance is $5,000, even though the check may never clear.

SCU's Br. in Supp., dkt. 11, at 3.

Not surprisingly, "[u]sing the available balance method often leads to more frequent overdrafts because there is less money available in the account due to holds and pending transactions." *Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230, at *1 (N.D. Ga. Nov. 6, 2017). Many account holders who have been subjected to overdraft charges based on "available balance" calculations not only feel blindsided by this, they feel that this practice is a breach of their contract with their credit union or bank. A series of virtually identical lawsuits has been filed across America challenging this practice. *See, e.g.*, *Walker v. People's United Bank*, 305 F. Supp. 3d 365 (D. Conn. 2018); *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338 (D.N.H. 2018); *Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230 (N.D. Ga. Nov. 6, 2017); *Smith v. Bank of Hawaii*, No. CV 16-00513 JMS-RLP, 2017 WL 3597522 (D. Haw. Apr. 13, 2017); *Ramirez v. Baxter Credit Union*, No.

---

to take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Doss*, 551 F.3d at 640. Judicial notice of the CFPB's report is warranted because it is a report of an administrative body. *See Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004)(taking judicial notice of administrative findings in public record); *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998)("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper."). Accordingly, plaintiff's unopposed request for judicial notice, dkt. 24, is granted as to this report. The other documents attached to plaintiff's request may be appropriate for judicial notice as well, but they are irrelevant to the motion to dismiss.

16-CV-03765-SI, 2017 WL 1064991 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009 (D. Nev. June 22, 2016); *Wodja v. Washington State Employees Credit Union*, 2016 WL 3218832 (W.D. Wash. June 9, 2016); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (W.D. Mich. 2016); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

The instant case is at least the fifth time lead counsel for both sides have squared off against each other in this type of a lawsuit. In the previous four cases, the defendant institution filed a motion to dismiss, winning two (*Tims* and *Chambers*) and losing two (*Walbridge* and *Ramirez*), although plaintiffs' counsel's batting average defeating dismissal motions is close to perfect in the other lawsuits.

## II. PLAINTIFF'S ALLEGATIONS

Plaintiff Matthew Domann is a resident of Portage, Wisconsin and was a member of SCU at all times relevant to the allegations in the complaint. SCU is a state-chartered, Wisconsin-based credit union and is a "financial institution" within the meaning of Regulation E.

SCU offers its consumer banking customers a checking account. One of the features of this checking account is a debit card, which the account holder can use to purchase goods and services. SCU checking account holders can also write checks, withdraw money from ATMs, schedule Automated Clearing House (ACH) transactions, and perform other debit transactions from the account.

On February 9, 2017, Domann was charged a $25 overdraft fee on a debit card payment of $4.63, which was made when Domann's ledger balance was $85.51. This is because SCU uses the "actual balance" rather than the "ledger balance" method when it determines whether an account holder has sufficient funds in his account to cover a transaction. Domann claims that by assessing him an overdraft fee on a positive ledger balance, SCU breached both its standard

membership agreement (which he refers to as the "Account Agreement") and the Regulation E Opt In Agreement.[3] According to Domann, these documents promise to use the "ledger balance" method of calculating whether the member's account contains available funds to cover a transaction, but SCU actually uses the "available balance" method. In addition, Domann alleges, SCU violated Regulation E by failing to describe SCU's actual overdraft practice.

Domann brings this class action to assert claims in his own right, and in his capacity as the class representative of all other persons similarly situated. The "class" is composed of three separate classes, only two of which are relevant to this motion. The "Positive Balance Class" includes

> All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.

The "Regulation E Class" includes

> All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.

SCU now moves to dismiss the breach of contract claims for failure to state a claim, arguing that the Account and Opt-In Agreements, construed together, unambiguously state that SCU would use the available balance method in assessing overdraft fees. SCU moves to dismiss

---

[3] Plaintiff did not attach copies of these documents to his complaint, but defendant has submitted copies with its motion to dismiss. Dkt. 12, Exhs. 1 and 2. The court may consider these documents in ruling on the dismissal motion. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.").

the equitable claims on the ground that they cannot be maintained where Domann has conceded that an express contract controls the parties' relationship. SCU moves to dismiss the Regulation E claim on the ground that it is untimely.

## III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## IV. DISCUSSION

### A. Breach of Contract

Domann's first two counts allege that SCU breached both the Opt-In Agreement and the Account Agreement by imposing overdraft fees based on his available balance instead of his ledger balance. In Wisconsin, a complaint states a claim for breach of contract when it alleges: "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages." *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289

6

Wis. 2d 795, 807, 714 N.W.2d 582, 588, *aff'd sub nom*. *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, ¶ 11, 297 Wis. 2d 606, 724 N.W.2d 879.[4]

SCU insists that plaintiff's claims fail because the contract cannot reasonably be read as providing that SCU would use the ledger balance method in assessing overdraft fees. "If the terms of the contract are plain and unambiguous, it is the court's duty to construe the contract according to its plain meaning even though a party may have construed it differently." *Woodward Commc'ns, Inc. v. Schockley Commc'ns Corp.*, 2001 WI App 30, ¶ 9, 240 Wis.2d 492, 498, 622 N.W.2d 756, 759-760. Thus, if a contract is unambiguous and the plaintiff's claims are unmerited under its terms, then dismissal of the complaint is appropriate under Fed. R. Civ. P. 12(b)(6). *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 991 (7th Cir. 1991) (terms of a written contract prevail over pleadings). On the other hand, if the contract is facially ambiguous, then dismissal is not appropriate. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992).

Whether a contract is ambiguous is a question of law. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). "A contract is ambiguous when its terms are reasonably susceptible to more than one interpretation." *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). Under Wisconsin law, "[t]he general rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Pronschinske Trust Dated March 21, 1995 v. Kaw Valley Companies, Inc.*, 899 F.3d 470, 473 (7th Cir. 2018), quoting *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 485 N.W.2d 217, 220 (1992). Moreover, the court must give contract terms their plain or ordinary meaning. *Id.,* citing *Huml v. Vlazny*, 293

---

[4] The parties appear to agree that Wisconsin law applies. This is consistent with Section 33 of the Account Agreement, which states that the contract is governed by the laws "of the state in which the Credit Union's main office is located."

Wis.2d 169, 716 N.W.2d 807, 820 (2006). Further, the court is to interpret the contract in a way that avoids absurd results. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 525 (7th Cir. 2008), citing *Kabes v. Sch. Dist.,* 270 Wis.2d 502, ¶ 11 (Ct. App. 2004); *see also Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶ 2, 351 Wis. 2d 123, 128, 839 N.W.2d 425, 427.

1. Opt In Agreement

The Opt In Agreement, officially titled "Debit Card Overdraft Coverage Consent," is a single-page, double-sided form through which a SCU member chooses to have certain overdrafts paid by SCU and to incur a fee for that service. Dkt. 12, Exh. 1. SCU's form mirrors in all material respects the A-9 Model Consent Form for Overdraft Services (§ 205.17). The Opt In Agreement states: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The Opt In Agreement explains that there are two kinds of protection: standard practices for protection as part of the SCU account and other overdraft protection plans that would link with another account, such as a savings account or a line of credit. The Opt In Agreement pertains to the standard practices.

The Opt In Agreement does not define or explain what is meant by the phrase "when you do not have enough money in your account to cover a transaction." Domann argues that the plain meaning of this phrase is that an overdraft would occur only when there was not enough money in the account, as shown by the ledger balance, to cover the transaction. SCU argues that the Opt In Agreement is part of the Account Agreement and must be read in conjunction with that Agreement. When the documents are read together, SCU argues, the plain meaning of "enough money" is the available balance.

Standing alone, the Opt In Agreement does not sufficiently define or explain the term "enough money" to put account holders on notice that "enough money" means the available balance. As Domann points out, the Opt In Agreement does not mention or explain the

8

available balance in any way, nor does it contain any language alerting the consumer that holds placed on funds earmarked for transactions that have not yet been settled or deposits that have not yet cleared can reduce the amount of money that is otherwise available for the consumer to use. This stands in contrast to the Opt In Agreement at issue in *Chambers*, 222 F. Supp. 3d at 10, a case cited by SCU, which specifically used the term "available balance" and included examples to illustrate what "not enough money in your account" meant, such as when the account holder "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available." Moreover, the Opt In Agreement in this case does not specifically reference the Account Agreement.

All of this being so, I agree with SCU that the Opt In Agreement must be construed together with the Account Agreement. As SCU notes, in Wisconsin, instruments executed at the same time between the same contracting parties in the course of the same transaction generally will be construed together. *Wipfli v. Bever*, 37 Wis. 2d 324, 326, 155 N.W.2d 71, 72 (1967); *Harris v. Metro. Mall*, 112 Wis. 2d 487, 496, 334 N.W.2d 519, 523 (1983) (same). Although Domann has not alleged when he entered into the respective agreements, he has not attempted to distinguish these cases on the ground that he executed the Opt In Agreement and the Account Agreement at separate times. Moreover, even if the agreements were not executed simultaneously, there would be no need for the overdraft coverage provided for in the Opt In Agreement were it not for the existence of a corresponding account established through the Account Agreement. *Accord Walbridge*, 299 F. Supp. 3d at 343–44 ("Although the Agreements are separate, they are arguably linked with respect to an account holder's overdraft protection."); *Smith*, 2017 WL 3597522, at *6 ("Simply stated, a customer cannot 'opt-in' to overdraft protection for an account that does not exist."). Accordingly, I find that the language of the Opt In Agreement must be construed together with the Account Agreement for purposes of the breach of contract claims.

2. Account Agreement

Customers at SCU are provided with a Membership Guide that covers the parties' rights and responsibilities concerning the account. Dkt. 12, Exh. 2. The Membership and Account Agreement, which is the first of three agreements or disclosures that constitute the Membership Guide, is 11 pages long and contains 34 sections. SCU points to a number of provisions in the Membership Guide that it says communicate the use of available balance, rather than ledger balance, as the trigger for potential overdraft fees. First, the "Withdrawal Restrictions" section of the Account Agreement provides:

> **a. Withdrawal Restrictions.** We will pay checks or drafts, permit withdrawals, and make transfers from *available* funds in your account. The *availability* of funds in your account may be delayed as described in our Funds Availability Policy Disclosure. We may also pay checks or drafts, permit withdrawals, and make transfers from your account from insufficient *available* funds if you have established an overdraft protection plan or, if you do not have such a plan with us, according to our overdraft payment policy.

> *Id.*, p. 5, ¶11 (emphases added).

Second, two paragraphs later, the Account Agreement's "Overdrafts" Section provides:

> **a. Payment of Overdrafts.** If, on any day, the *available* funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient *available account balance* may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient *available* funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

> *Id.*, p. 6, ¶ 12 (emphases added).

Third, in the "Fund Transfers" section, the Account Agreement specifies that SCU is "not obligated to execute any order to transfer funds out of your account if the amount of the requested transfer plus applicable fees exceeds the *available funds* in your account." *Id*., p.4, ¶ 9 (emphasis added).

Finally, SCU points to its "Funds Availability Policy Disclosure," a one-and-a half-page document contained within the Membership Guide and referred to explicitly in the "Withdrawals" section set out above, which explains that not all funds deposited by check will be "available" immediately for use. *Id*., pp. 11-12. This policy explains that in some cases

> [f]unds may not be available until the second business day after the day of your deposit. However, the first $200.00 of your deposit will be available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the same business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available.

*Id*. at 12.

When these provisions are read in context and as a whole, argues SCU, the only reasonable way to interpret the contract is that SCU will assess overdrafts based on the member's available balance, rather than the ledger balance.

I agree. As an initial matter, the term "available" is used to modify the term "funds" or "account balance" several times throughout the Account Agreement, including three times in the "Overdrafts" section. If this term meant "all of the funds" in the member's account, as Domann urges, then the adjective "available" would be meaningless and unnecessary. Such a construction would violate the rule that "a construction which gives effect to every word of a contract should be preferred to one which results in surplusage." *McCullough v. Brandt*, 34 Wis. 2d 102, 106, 148 N.W. 2d 718 (1967) (citation omitted). The word "available" has meaning only if it denotes something other than "all of the funds" or "actual balance."

11

The conclusion that "available" means something other than "actual" is not only supported by the rules of contract construction, but it is spelled out in the contract itself. In particular, the "Withdrawals" section—which appears before and refers to the overdrafts policy—refers explicitly to the Funds Availability Policy. By its express terms, this policy informs the member that the entirety of funds deposited into the account will not necessarily be "available to you on the same business day that we receive your deposit." Giving this section its plain reading, it conveys clearly that there may be a difference between the actual balance on a member's account and the amount of funds that are "available" for the member to use. Thus, although it is true that the Account Agreement does not have a glossary or expressly define the term "available account balance" or "available funds," the Funds Availability Policy makes clear that the word "available" has a specific meaning and that funds "available" in a customer's account may be a subset of the dollars shown on the ledger balance.

Domann points out that other federal district courts have denied motions to dismiss after concluding that the relevant agreements were ambiguous as to whether the actual or available balance would be used to determine if an account was in overdraft. *See, e.g.*, *Walker*, 305 F. Supp. 3d at 371; *Walbridge*, 299 F. Supp. 3d at 346; *Smith*, 2017 WL 3597522, at *5; *Ramirez*, 2017 WL 1064991, at *5; *Gunter*, 2016 WL 3457009, at *3; *Wodja*, 2016 WL 3218832 at *3; *Pinkston-Poling*, 227 F. Supp. 3d at 855. Having read and considered these cases, I do not find that their reasoning compels a different result. Many of the account agreements at issue in these cases did not contain (or the court did not mention) a Funds Availability Policy like the one referenced in Domann's Account Agreement. In fact, several of these cases did not use the term "available" at all.

Although the courts in *Walbridge* and *Ramirez* found ambiguity in spite of a Funds Availability Disclosure, neither case convinces me that I should do the same here. In *Walbridge*, 299 F. Supp. 3d 338, the court discounted the funds availability policy because it "was not

12

linked to the Opt In Agreement or to the parts of the Account Agreement that discussed overdrafts." *Id*. at 346. However, the "overdrafts" section of the account agreement at issue in *Walbridge* did not use the term "available funds" or "available account balance," but instead merely used the term "insufficient funds." *Id*. at 344. In this case, by contrast, SCU's "overdrafts" section uses the term "available" multiple times, and the section appears within the Account Agreement only two paragraphs after the "withdrawals" section, which contained a specific reference to the Funds Availability Policy.

*Ramirez*, 2017 WL 1064991, is more on point, but I respectfully disagree with the court's analysis leading to a finding of ambiguity. The *Ramirez* court appears to have given short shrift to the inconsistency between the language of the Funds Availability Policy—which clearly signifies that not all funds shown on an account holder's ledger balance are "available"—and the plaintiff's insistence that the term "available balance" as used elsewhere in the account agreement could reasonably mean ledger balance.

I am more persuaded by the decisions in *Chambers,* 222 F.Supp.3d 1, and *Tims*, 2017 WL 5133230, in which the courts found the existence of funds availability disclosures to be fatal to the plaintiff's claim that her bank breached a promise to assess overdraft fees only on transactions that overdrew her ledger balance. Relying on the language of the funds availability disclosure, these courts found that "[w]hen the account agreement refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions—exactly the type of restrictions that can create a divergence between the actual and available balances in the first place." *Chambers*, 222 F. Supp. 3d at 11 (citation omitted); *Tims*, 2017 WL 5133230 at *4 (quoting *Chambers*). Both courts found that, when the funds availability disclosure was read in the context of the agreements as a whole, the agreements could only be reasonably interpreted as providing for use of the available balance method, not the ledger balance method, for assessing overdrafts. Reading Domann's contract in a similar fashion, I reach the same conclusion here.

13

As a final observation, I note that Domann makes much of the fact that the Funds Availability Policy explains only that funds might not be available when a hold is placed on a deposit, without also informing the member that funds might also be reduced as a result of holds placed on funds earmarked for pending transactions. Complaint, ¶ 36; Plt.'s Br., dkt. 23, at 14. Accepting this as true, the fact that SCU omitted relevant information from its account contract concerning holds on pending transactions does not mean that SCU promised to use the ledger balance when assessing overdrafts, which is what Domann must show to proceed on his breach of contract claims.

To be sure, the Account Agreement–and the "Overdrafts" section in particular–could have been written more clearly to explain how the "available balance" method works and its potential impact on overdraft charges. But the question presented to the court is not whether SCU could have or should have explained its procedures more clearly, the question is whether the terms as written reasonably can be understood as a promise by SCU to use a member's actual or "ledger" balance when assessing overdraft fees. The contract at issue cannot reasonably be read this way. Accordingly, Domann's breach of contract claims will be dismissed.

**B. Unjust Enrichment and Money Had and Received**

SCU moves to dismiss Domann's equitable claims for unjust enrichment and money had and received (the Fifth and Sixth Causes of Action) on two grounds: first, the two claims are indistinguishable, *see Meyer v. The Laser Vision Institute*, 290 Wis. 2d 764, 778 (Ct. App. 2006) (stating unjust enrichment and money had and received are same cause of action); second, neither claim can be maintained because the parties entered into a written contract addressing the same subject matter. Domann acknowledges that he cannot recover on both a contract theory and an unjust enrichment theory but contends that he may plead these theories in the alternative. Br. in Opp., dkt. 23, at 28.

Domann is correct, but only to a point. A party *can* plead quasi-contract and contract claims in the alternative, but only in limited situations. As the court explained in *U.S. ex rel. Roach Concrete, Inc. v. Veteran Pac., JV*, 787 F. Supp. 2d 851, 859 (E.D. Wis. 2011), one of the cases cited by plaintiff:

> Where a plaintiff asserts a breach of contract claim and fails to allege any facts from which it could at least be inferred that the contract on which that claim is based might be invalid, the plaintiff is precluded from pleading in the alternative claims that are legally incompatible with the contract claim. This is but an application of the rule that "[a] plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits. . . ." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (quoting *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006)).

In Wisconsin, "[t]he doctrine of unjust enrichment does not apply where the parties have entered into a contract." *Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis. 2d 653, 671, 553 N.W. 2d 257, 265 (Ct. App. 1996) (citing *Continental Cas. Co. v. Wis. Patients Comp. Fund*, 164 Wis. 2d 110, 118, 473 N.W. 2d 584, 587 (Ct. App. 1991)).

Throughout his complaint, Domann asserts that he entered into "binding" contracts with SCU in which SCU promised to do certain things that it did not do. Domann's claims for unjust enrichment and money had and received are not based upon an alternative theory under which there is no express contract; to the contrary, both counts incorporate by reference all of the breach of contract allegations. Complaint, dkt. 1, at ¶¶ 88, 92. Domann's allegations that the parties' relationship is governed by the terms of express, written contracts are thus incompatible with his quasi-contract theories. As a result, those claims must be dismissed. *Accord Thekan v. Revane*, 1998 WL 692324, *1, 222 Wis. 2d 624, 587 N.W. 2d 457 (Table) (unpublished disposition) (upholding trial court's dismissal of plaintiff's alternative unjust enrichment claim where plaintiff brought breach of express contract claim covering same

subject); *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (same) (applying similar Illinois law).

## C. EFTA Claim

Finally, SCU moves to dismiss Count 7, in which Domann alleges that SCU violated Regulation E of EFTA, 12 C.F.R. § 1005.17, by not accurately describing SCU's overdraft service in the Opt In Agreement. SCU moves to dismiss the claim on the grounds that the claim is untimely.

Generally, 15 U.S.C. § 1693m imposes civil liability on an institution that fails to comply with the provisions of EFTA. 15 U.S.C. § 1693m(a). EFTA claims must be brought "within one year from the date of the occurrence of the violation." § 1693m(g). Domann does not allege facts to show when he signed the Opt In Agreement. He does allege, however, that he was charged overdraft fees, based on the Opt In Agreement, on four occasions in 2017: February 9, February 10, November 7 (his business account), and December 7. Domann filed his complaint on March 9, 2018, within one year of his November and December 2017 overdraft fees but more than one year after he was assessed the February 2017 overdraft fees.

SCU argues that an EFTA violation "occurs" (and starts the one-year clock) when the *first* overdraft fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E, whereas Domann argues that a one-year clock begins anew with *each* improper overdraft fee. The bulk of authority is on SCU's side. Although the Seventh Circuit has not addressed the precise issue, most district courts that have considered the EFTA statute of limitations have concluded that the limitation period is triggered when a financial institution makes a first unauthorized transfer or charges an overdraft fee, rejecting the application of a "continuing violation" theory. *See, e.g.*, *Walbridge*, 299 F. Supp. 3d at 350 (overdraft fee); *Wheeler v. Native Commerce Studios*, LLC, 2018 WL 447716, at *1–*2 (W.D. Mich. Jan. 17,

2018) (unauthorized transfer); *Whittington v. Mobiloil Federal Credit Union*, 2017 WL 6988193, *2–*4 (E.D. Texas, Sept. 14, 2017) (overdraft fee) (citing and discussing cases); *Harvey v. Google*, 2015 WL 9268125, at *3 - *4 (N.D. Calif. Dec. 21, 2015) (unauthorized transfer); *Repay v. Bank of America, N.A.*, 2013 WL 6224641, *4-*5 (N.D. Ill. Nov. 27, 2013) (recurring transfer). In *Harvey*, 2015 WL 9268125, at *4, the court explained the reasoning behind this rule:

> Although the consumer is financially injured with each transfer, the basis of the wrongful conduct is the failure to obtain proper authorization in the first instance. The EFTA claim based on such conduct is fully consummated when the first unauthorized transfer is made.

Domann attempts to distinguish these cases on the ground that an overdraft fee is non-recurring, unlike the recurring transfers at issue in some of the cases cited above. He finds support for his position in *Smith*, 2018 WL 1662107 at *5, in which the court saw a distinction between preauthorizing a series of transfers and opting in to an overdraft service, explaining:

> In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.

The *Smith* court saw this as a reason to treat each overdraft fee separately that triggered a new one-year limitations period. *Id*.

With all due respect, the reasoning of *Smith* is not persuasive. As a general rule, a statute of limitations begins to run when the plaintiff has "a complete and present cause of action" upon which the plaintiff "can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195, 201 (1997). "Customarily, that is true when the defendant breaches a duty (here a duty imposed by statute) and the claimant is injured." *Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009). Here, Domann alleges that SCU violated the EFTA by failing "to comply with the 12 C.F.R. § 1005.17 opt-in requirements,

including failing to provide its customers with a valid description of the overdraft program . . .". Complaint, dkt. 1, ¶99. Thus, the alleged wrongful conduct is based on a single omission: the failure of SCU's opt-in contract to explain that SCU would use the "available" balance in the account rather than the "ledger" balance when assessing overdrafts.

I accept that Domann was not *injured* by this conduct until he was first assessed an overdraft fee based on an insufficient available balance. *Accord Wike*, 566 F.3d at 593 (finding that one year limitations period for alleged violation of EFTA's restriction on "preauthorized electronic fund transfers" occurred when first recurring transfer took place, not when payee arranged it). However, there is no basis to find that a new cause of action accrued with each new overdraft fee. Domann does not allege that it was improper *per se* for SCU to charge him an overdraft fee, but only that SCU misled him about the circumstances under which it would charge such a fee. Domann was aware–or should have been aware–that he had been misled when the first overdraft charge took place on February 9, 2017. At that time, his EFTA claim based on the alleged Regulation E violation was fully consummated. It did not begin anew with subsequent overdraft charges.

Taking a different tack, Domann contends that, pursuant to the discovery rule, the statute of limitations did not start to run until he met with his attorney in December 2017. Under federal law, the discovery rule "starts the statute of limitations running only when the plaintiff learns that he[ has] been injured, and by whom." *United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010), citing *United States v. Kubrick*, 444 U.S. 111 (1979); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Although a plaintiff does not need to negate a statute of limitations defense in his complaint, he must ultimately show that "even with the exercise of reasonable diligence [he] could not have known of the purported injury" in time to file a timely complaint. *Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994).

Domann asserts that he could not discover before meeting with his lawyer that SCU was using the "available balance" method in assessing overdrafts because that fact was not disclosed in his account agreements. Br. in Opp., dkt. 23, at 26-27. This argument is unpersuasive. In the complaint, Domann alleges that he was charged an overdraft when his account had a positive ledger balance, and his EFTA claim is based on the premise that SCU's Opt-In Agreement said SCU would *not* assess overdraft fees when there was a sufficient positive ledger balance to cover the withdrawal or debit. On the basis of these allegations, then, Domann should have known when he was charged his first overdraft on a positive ledger balance that SCU was *not* using the ledger balance method to assess overdraft fees. At the very least, Domann would have had reason upon receiving the overdraft charge to review his account statement and account documents to find out what SCU's overdraft policy was and whether SCU was violating it. Thus, I agree with other courts that have found that, with reasonable diligence, plaintiff could have discovered his injuries when he received his first overdraft charge either by viewing his online account or looking at his bank statement.[5] *Whittington*, 2017 WL 6988193, *13 (rejecting application of discovery rule); *Walbridge*, 299 F. Supp. 3d at 351 (plaintiff failed to explain why he could not have discovered that fees were improperly charged); *Harvey*, 2015 WL 9268125, *4 (rejecting plaintiff's EFTA claim as untimely where she failed to view her bank statements and discover improper fees).

Finally, Domann argues that, because he did not realize until he met with counsel in December 2017 that SCU's assessment of a single overdraft was "part of a systematic practice" that harmed an entire class of plaintiffs, he should be entitled to the exception announced in *Goodhand v. United States*, 40 F.3d 209 (7th Cir. 1994). In *Goodhand*, 40 F.3d at 212-13, the Seventh Circuit adopted a "trivial injury" exception for claims brought under the Federal Tort

---

[5] In reaching this conclusion, I have relied solely on the complaint and not on either version of Domann's account statement submitted by the parties. *See* Dkt. 12, exh. 3 and Dkt. 19.

Claims Act, holding that where an injury is reasonably initially thought to be too slight to warrant the expense, inconvenience and uncertainties of litigation, the running of the statute of limitations is suspended until the injury is discovered to be serious. Domann cites no case extending this rule—which applies to personal injuries—to consumer class actions. The reason for this lack of authority is obvious: taken to its logical conclusion, Domann's argument would effectively suspend the limitations period for all putative class actions until the date on which a potential class representative met with class counsel and learned the "scope" of the harm. Nothing in *Goodhand* supports such an enormous extension of a limited exception to the ordinary discovery rule.

In sum, with reasonable diligence Domann would have known of his injury when he received his first overdraft fee on February 9, 2017. Because he did not file his lawsuit until more than one year later, the EFTA claim is untimely.

ORDER

IT IS ORDERED THAT defendant's Motion to Dismiss plaintiff's First, Second, Fifth, Sixth and Seventh Causes of Action under F. R. Civ. P. 12(b)(6) is GRANTED.

Entered this 13th day of September, 2018.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge